UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-cv-24195-MOORE/BECERRA
(Crim. Case No. 17-cr-20898-KMM)

EDWARD DIMARIA,

     Movant,

v.

UNITED STATES OF AMERICA,

     Respondent.

_____/

## MOVANT'S REPLY TO GOVERNMENT'S RESPONSE
## TO MOTION TO VACATE SENTENCE UNDER 28 U.S.C. § 2255

Movant, EDWARD DIMARIA, through undersigned counsel files this his Reply to the Government's Response to Movant's Motion to Vacate Sentence Under 28 U.S.C. § 2255, renews his request for an evidentiary hearing, and states the following:

The government's response fails to mount a viable challenge to the claims made by Mr. DiMaria in his Motion to Vacate.  Rather, the government simply restates portions of the plea agreement, factual proffer, plea colloquy and sentencing proceedings while ignoring the obvious, i.e., that counsel's deficient performance including the failure to investigate the factual and legal underpinnings of the government's case, failure to properly evaluate and follow up on available information compiled and analyzed by experts negating Mr. DiMaria's guilt and misadvising him with regard to the government's burden of having to prove beyond a reasonable doubt critical elements of each of the charges, including the requirement to prove materiality, resulted in an uninformed, constitutionally infirm plea of guilty by an actually innocent individual.  The government's recitation of the record of the plea itself cannot cure the injustice that resulted from

counsel's deficient performance. Beyond that, the government to this day has still not been able to articulate a factual and legal basis for the $25 million loss figure that, upon the misadvice of counsel, Mr. DiMaria was led to agree to. That unsupported loss calculation that counsel inexplicably failed to challenge was the basis for the dramatic increase in Mr. DiMaria's guideline sentencing range that ultimately resulted in the imposition of a statutory maximum 10-year sentence. Finally, in an effort to justify counsel's deficient performance, the government offers, instead of evidence to contradict the allegations of the motion to vacate, government counsel's proffer of opinion that Mr. DiMaria's counsel were highly skilled white collar criminal defense attorneys who secured Mr. DiMaria a substantial bargain. However, the *government's* opinion of an attorney or the representation afforded is not and has never been the yardstick by which effective assistance of counsel is measured under the Sixth Amendment.[1]

In its response, the government reiterates its underlying theory of the case filed against Mr. DiMaria, i.e., that he engaged in what is described as a cookie jar accounting scheme. The premise of cookie jar accounting is, according to the government, the recording of unnecessary and unsupported expense accruals in quarters where it was determined that Bankrate's financial performance was satisfactory. The goal was to lower earnings in that satisfactory quarter while still being able to meet financial analysts' expectations. The government contends that when Bankrate's performance in a subsequent quarter was unsatisfactory or fell short of meeting analysts' expectations, the accruals in the cookie jar would be selectively reversed thus artificially inflating

---

[1] It should be noted that Mr. DiMaria's lead counsel no longer practices law. Shortly after Mr. DiMaria's sentencing he left his practice to pursue what, since November 2016, had become his all-consuming political passion—removal of the President of the United States. *See, e.g.*, Newsweek September 2019 describing House Judiciary Committee majority counsel Barry Berke as the unexpected star of President Trump's former campaign manager Corey Lewandowski's congressional hearing.

earnings in a bad quarter to meet or exceed analysts' revenue expectations. The government continues to cling to its absurd notion that a cookie jar accounting fraud scheme occurred at Bankrate.  It did not.  In fact, a straightforward analysis is all that is needed to easily disprove this allegation.  Reviewing the table below (obtained from the government itself) of the various financial metrics reported during the relevant period demonstrates the polar opposite of what a cookie jar fraud scheme would show.

| Quarter / Metric | Analyst Consensus | Bankrate Actual |
|---|---|---|

**Q3  2011**

| | | |
|---|---|---|
| Adjusted EPS | 0.138 | 0.18 |
| Adjusted EBITDA | | $36.0 million |
| Revenue | $99.9 million | $112.9 million |

**Q4  2011**

| | | |
|---|---|---|
| Adjusted EPS | 0.152 | 0.19 |
| Adjusted EBITDA | $34.0 million | $38.5 million |
| Revenue | $104.3 million | $113.8 million |

**Q1  2012**

| | | |
|---|---|---|
| Adjusted EPS | 0.194 | 0.18 |
| Adjusted EBITDA | $39.8 million | $37.8 million |
| Revenue | $126.8 million | $125.0 million |

**Q2  2012**

| | | |
|---|---|---|
| Adjusted EPS | 0.174 | 0.18 |
| Adjusted EBITDA | $37.2 million | $37.5 million |
| Revenue | $123.6 million | $122.1 million |

Available data confirms that in both the third and fourth quarter of 2011, Bankrate substantially outperformed the analysts' projections with regard to adjusted earnings per share,

"EPS," adjusted earnings before interest, taxes, depreciation and amortization, "EBITDA," and revenue. Despite Bankrate exceeding analyst expectations in a variety of accounting metrics (for example Bankrate exceeded adjusted EBITDA for Q4 2011 by $4.5 million), there were no corresponding cookie jar expense accruals made to "lower" these results to "save" them for future quarters. Immediately following Q4 2011, for example in Q1 2012, the quarter with which the government charged movant with making false entries, Bankrate failed to meet analyst expectations with regard to EPS, EBITDA and revenue. Yet there are no material expense reversals that were utilized in an effort to meet the analysts' expectations. The quarter was missed by $2 million and yet movant did not engage in the practice the government accused him of, despite his having a perfect opportunity to do what a "cookie jar" scheme would entail, given the results of Q3 and Q4 2011. The first quarter was still a substantial miss and there never were any cookie jar funds reserved or made available to make the quarter.

Had counsel properly investigated the case and built upon information previously compiled by experts and the SEC civil investigation in New York of Bankrate, he would have recognized the government's case for precisely what it is—a factually and legally unjustifiable effort to criminalize non-material accounting adjustments that neither hid or distorted the true financial condition of the company in an effort to meet or exceed Wall Street analyst expectations or for Mr. DiMaria to unjustly enrich himself.

For example, thorough investigations conducted at the behest of Bankrate's Board of Directors and Audit Committee by the independent auditors Grant Thornton as well as outside counsel Wachtell Lipton justifiably concluded that there was neither fraud nor any material misstatements in Bankrate's financials. In fact, any and all accounting errors or irregularities identified were deemed not to be material and no adjustments were recommended to be made to the

company's books. Moreover, contrary to what the government has suggested, Wachtell Lipton did not act at the direction of management. As the government well knows, that firm represented and acted at the direction of the Board of Directors and Independent Audit Committee. The government seeks to minimize the importance of Wachtell Lipton's conclusion by erroneously stating that they only focused on three specific entries. Yet, as the government also well knows this is simply false. At various times the government has acknowledged that Wachtell Lipton made an extensive and convincing presentation to the SEC regarding its robust review of accounting issues.[2]

A further example of the overwhelming lack of materiality appears in, the accounting entries charged in Counts 5, 6, and 7 of the superseding indictment in the aggregate total $360,000. That sum is less than 1% of Bankrate's 2012 first quarter revenue of $125,000,000 as well as the EBITDA of $37,000,000.00. The generally accepted materiality threshold for accounting purposes is 5%. Further, the government failed to take into accounting entries by movant that offset (and therefore even further undermine the purported materiality or impact of) any challenged accounting decisions relevant to Q1 2012.

A cursory examination of the Bankrate balance sheet as of March 31, 2012, demonstrates the same lack of materiality with regard to the government's allegations that there was a $1,800,000

---

[2] Likewise, the government fails to address the glaring fact that these two firms—Grant Thornton and Wachtell Lipton—signed off on registration statements after completing their own investigations and participating in the SEC investigation in August 2013 (approximately 12 months after the SEC investigation began) and in February 2014 (approximately 17 months after the investigation began). Under no circumstance would they have done this if they believed any material misstatement of the financials (any fraud) existed. The financials at issue were included in the registration statement. Further, the banks, law firms, and experts involved in the financings were also aware of the SEC investigation and completed their own due diligence on the facts and concluded the same. The government supposition that such investigations were incomplete or otherwise flawed is simply not credible, especially given what was at stake to the reviewing firms. The logical, persuasive, accurate explanation is that the government criminalized non criminal conduct and distorted any calculation of loss.

cookie jar cushion of unsubstantiated expense accruals. As of that date Bankrate had total consolidated assets exceeding $1.1 billion and total consolidated liabilities approaching $350 million. The purported cushion is less than .2% of total assets and .5% of total liabilities—again, far below traditionally accepted materiality thresholds.

The government unsurprisingly fails to address the conspicuous lack of materiality in the questioned accounting entries and in fact makes no effort to show how they could conceivably be material or for that matter to affect the investing public. Moreover, the government cannot in good faith demonstrate or even as what currently appears to be the go-to standard, "presume" that Bankrate's financials did not meet the prevailing standard of being fairly stated in all material respects. Finally, the government offers no explanation justifying counsel's overlooking or ignoring this glaring flaw in the government's case and not adequately explained it to Mr. DiMaria.

The government likewise does not and cannot dispute that the chief financial officer of the company is afforded fairly wide discretion concerning decisions as to when and how to book entries reflecting current and future expense accruals and deal costs, contrary to what the government may suggest, and that it is entirely appropriate and not unlawful to utilize non-generally accepted accounting principles, i.e., "non GAAP," in reporting a company's financials. For example, studies confirm that 97% of S&P 500 companies employ non GAAP metrics and adjustments in compiling their financials; and the utilization of these metrics and adjustments is not considered criminal. Mr. DiMaria's counsel failed to investigate and incorporate this vital information into what would have been a viable defense to the entirety of the charges initially filed.

Both the auditors and Wachtell Lipton were well aware of the accounting issues and the amounts involved. Contrary to what the government suggests, all relevant documents required or needed to complete an accurate audit were provided. Had counsel conducted a proper investigation

this would have been readily apparent. This would have undercut the government's allegations that Mr. DiMaria had sent letters to the auditors falsely certifying that he had made available all financial records and related data. Coupled with other investigative and expert findings concerning Bankrate's financials, it would have demonstrated that in those letters he truthfully confirmed that he had no knowledge of fraud or suspected fraud affecting Bankrate involving Bankrate's management; and that he was not aware of any information indicating that an illegal act may have occurred.

In its response government alludes to the filing of a false financial report with the SEC. The government conveniently omits any reference to the alleged falsity being material. As we have already demonstrated there are not now and never were any materially false entries in Bankrate's books. Any statement in the SEC filing, even if not accurate, was not materially false and counsel should have discovered and challenged the baseless assertion made by the government.

Perhaps the most glaring deficiency in the government's response is the failure to offer a scintilla of evidence or reasoning supporting the $25,000,000 loss figure incorporated into the sentencing guidelines calculus. Nor, does the government explain why or how absent constitutionally defective advice of counsel Mr. DiMaria would have agreed to that loss figure. Where, as the government concedes, counsel had or should have had access to expert analysis clearly refuting that loss figure advice from counsel to his client to accept that number cannot be anything other than objectively deficient performance.

### Binding case law supports the movant's claims

As the Eleventh Circuit has recognized, *see Montemoino v. United States*, 68 F.3d 416, 417 (11th Cir. 1995), issues affecting the deprivation of constitutional rights leading to the entry of a guilty plea are of a nature to require evidentiary development in a § 2255 motion and are ordinarily not appropriate for mere cold record review. *Id.* ("*[T]he* few grounds upon which the guilty plea

7

may be challenged are not limited to direct appellate review, but instead are more appropriately raised in § 2255 proceedings ... .") (citing *Ferguson v. United States*, 699 F.2d 1071, 1073 (11th Cir. 1983) (emphasis added); *see also United States v. Kriescher*, 366 Fed.Appx. 666 (7th Cir. 2010) (claim that guilty plea was involuntary because of prior counsel was best pursued on collateral review so that more complete record could be developed); *United States v. Murphy*, 899 F.2d 714, 716 (8th Cir.1990) (claim of involuntary guilty plea must first be presented to district court, and is not cognizable on direct appeal); *cf. Finch v. Vaughn*, 67 F.3d 909, 914 (11th Cir. 1995) (relief for involuntary plea first sought on habeas where grounds learned after sentencing).

In the plea context, counsel must "provide his client with an understanding of the law in relation to the facts, so that the accused may make an informed and conscious choice between accepting the prosecution's offer and going to trial." *Wofford v. Wainwright*, 748 F.2d 1505, 1508 (11th Cir. 1984); *accord Downs-Morgan v. United States*, 765 F.2d 1534, 1539 (11th Cir. 1985). An attorney's responsibility is to investigate and to evaluate his client's options in the course of the subject legal proceedings and then to advise the client as to the merits of each. *Tafero v. Wainwright*, 796 F.2d 1314, 1320 (11th Cir. 1986); *Thompson v. Wainwright*, 787 F.2d 1447, 1451 (11th Cir. 1986). And as to sentencing errors by counsel, the significant likely effect of the errors calls for review at an evidentiary hearing. *See Glover v. United States*, 531 U.S. 198, 203 (2001) (even if lawyer's representational error caused only 6 months additional jail time, that is sufficient to warrant relief).

### An Evidentiary Hearing is Warranted to Address Movant's Claims

The law applicable to motions under 28 U.S.C. § 2255 is clear that an evidentiary hearing must be held where "the petitioner alleges facts that, if true, would entitle him to relief." *Aron v. United States*, 291 F.3d 708, 714–15 (11th Cir. 2002) (quotation omitted). "The law is clear that,

in order to be entitled to an evidentiary hearing, a petitioner need only allege—not prove—reasonably specific, non-conclusory facts that, if true, would entitle him to relief." *Id.* at 715 n.6. Once the movant alleges facts which, if true, would entitle him to relief, a hearing is required.

Thus, in this case, because the relevant facts concerning counsel's performance and the defendant's understanding of the relevant factors in evaluating the plea have not yet been reliably found at a full and fair hearing on those issues as raised in the § 2255 motion, and the government has offered no contrary facts, much less facts that conclusively show that the movant is not entitled to relief, an evidentiary hearing is clearly required. *See Fontaine v. United States*, 411 U.S. 213, 215, 93 S.Ct. 1461, 1462 (1973) (reversing summary dismissal and remanding for a hearing because the record of the case did not "'conclusively show' that under no circumstances could the petitioner establish facts warranting relief under § 2255"). Notably, the government has filed no affidavit in response to the sworn allegations of movant § 2255 motion, and even in its proffers has failed to even call into evidentiary question the movant's allegations.

An evidentiary hearing is needed to resolve the claims presented in movant's § 2255 motion. *See Gallego v. United States*, 174 F.3d 1196, 1198–99 (11th Cir. 1999) (reversing denial of § 2255 challenge based on counsel's failure to properly advise defendant of scope of right to testify and that only defendant could waive it; rejecting rule that would credit counsel's statements over the defendant's sworn § 2255 assertions; remanding for evidentiary hearing).

WHEREFORE, Movant requests that the Court grant his claim for relief under 28 U.S.C. § 2255 and grant his request for an evidentiary hearing on the motion to vacate.

Respectfully submitted,

s/ John E. Bergendahl
John E. Bergendahl, Esq.
Fla. Bar No. 327761
25 S.E. 2nd Avenue, Suite 1100
Miami, Florida 33131
Tel. (305) 536-2168
Fax (305) 536-2170
E-Mail lojeb1100@gmail.com

/s/  Richard C. Klugh
Richard C. Klugh, Esq.
Fla. Bar No. 305294
25 S.E. 2nd Avenue, Suite 1100
Miami, Florida 33131
Tel. (305) 536-1191
Fax (305) 536-2170
E-Mail klughlaw@gmail.com

## CERTIFICATE OF SERVICE

I HEREBY certify that on ___November 22, 2019___, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.

s/ John E. Bergendahl
John E. Bergendahl, Esq.